JOHN G. GROPPO, COMMISSIONER OF REVENUE SERVICES
*v.* ELIZABETH H. JACKS, EXECUTRIX
(ESTATE OF ROBERT L. JACKS)
(13451)

HEALEY, SHEA, CALLAHAN, COVELLO and HULL, Js.

Argued December 8, 1988—decision released March 7, 1989

*William J. Friedeberg,* tax attorney II, with whom, on the brief, were *Joseph I. Lieberman,* attorney general, and *Albert E. Sheary,* first assistant commissioner of revenue services, for the appellant (plaintiff).

*Mark W. Dost,* with whom, on the brief, was *Charles W. Henry,* for the appellee (defendant).

SHEA, J. The issue in this case is whether a mortgage debt as described in General Statutes § 12-350 (h)[1] that is discharged from tax exempt insurance proceeds under General Statutes § 12-342,[2] "reduces the gross taxable estate" for purposes of computing the state succession tax. We agree with the trial court that such a debt reduces the gross taxable estate under § 12-350, and accordingly, we find no error in the judgment.

[1] General Statutes § 12-350 provides in part: "In the case of the estate of a resident transferor, the net estate for the purposes of the tax imposed by the provisions of this chapter shall be ascertained by deducting from the gross taxable estate the following items . . . (h) the amount at the date of the transferor's death of all unpaid mortgages upon real or personal property situated within this state, which mortgages were not deducted in the appraisal of the property mortgaged . . . . The foregoing deductions shall be allowed in the case of property transferred by will and by laws relating to intestate estates, provided they reduce the gross taxable estate. . . ."

[2] General Statutes § 12-342 provides: "The provisions of sections 12-341 and 12-341b shall not apply to the proceeds of any policy of life or accident insurance payable to a named beneficiary or beneficiaries, including such proceeds payable to a trustee or trustees under an inter vivos or testamentary trust or the proceeds of any insurance policy of a decedent payable at his death to his estate, the executors of his will or the administrators of his estate. The proceeds of any insurance policy issued by the United States and generally known as war risk insurance, United States government life insurance or national service life insurance shall not be taxable within the provisions of this chapter."

The parties have stipulated to the relevant facts in this case. Robert L. Jacks (the decedent) owned real estate in Middlebury, having an appraised value of $330,000, subject to a mortgage to Connecticut Bank and Trust Company (CBT) in the amount of $150,000. To ensure payment of the outstanding indebtedness, the decedent elected to participate in a group credit life insurance plan between CBT as policyholder and Aetna Life Insurance Company (Aetna). The policy provided that if the decedent were still indebted to CBT at the time of his death, and if his premium payments were current, Aetna would pay the balance due on the CBT mortgage once it had received proof of the decedent's death. The decedent died on December 31, 1983. On February 8, 1984, following the receipt of proof of the decedent's death, Aetna paid CBT $150,000 and thereby discharged the mortgage debt on the Middlebury property.

On the decedent's succession tax return, the defendant, Elizabeth H. Jacks, executrix of the decedent's estate, reduced the value of the decedent's interest in the Middlebury property by $150,000, the balance due on the CBT mortgage at the time of his death. The plaintiff, the commissioner of revenue services, disallowed the deduction and claimed as taxable the entire $330,000 value of the Middlebury property. The Probate Court, *Lawlor, J.*, sustained the objection of the estate and ordered the commissioner to recompute the succession tax by allowing the estate a deduction for the mortgage debt to CBT. The trial court, *Hartmere, J.*, dismissed the commissioner's appeal, holding that the debt was deductible for succession tax purposes, regardless of the source of payment. This appeal followed.

The computation of the Connecticut succession tax is based upon the net taxable estate. General Statutes § 12-344. The value of the net taxable estate is arrived

at by subtracting from the gross taxable estate the debts, charges, taxes and other expenses that are enumerated in General Statutes § 12-350. See *Connelly* v. *Wells,* 142 Conn. 529, 533, 115 A.2d 444 (1955). One of these items is "the amount at the date of the transferor's death of all unpaid mortgages upon real or personal property situated within this state . . . ." General Statutes § 12-350 (h). Section 12-350 provides further that such a deduction is allowable only if the debt "reduce[s] the gross taxable estate." The commissioner claims that in order for a debt to "reduce the gross taxable estate" under § 12-350, it must be extinguished with taxable assets. General Statutes § 12-342, on the other hand, exempts from taxation, inter alia, the proceeds of any life insurance policy payable to a named beneficiary. In this case, therefore, the debt which was the basis for a deduction was discharged by the tax exempt proceeds of a credit life insurance policy.[3] Thus, the taxable assets of the estate were not ultimately used to discharge the debt. The estate claims that if the deduction for the mortgage indebtedness is not allowed, then the full value of the Middlebury property would be taxed, including that portion of the property's value corresponding to the proceeds of the insurance policy. This result, the estate maintains, would constitute an indirect tax of otherwise tax exempt insurance proceeds.

Section 12-342, therefore, when read in conjunction with § 12-350, creates an ambiguity in the phrase "reduce the gross taxable estate," because of the poten-

---

[3] At oral argument, the commissioner acknowledged that credit life insurance is customarily payable to a named beneficiary. He claimed, nonetheless, that the broad tax exemption found in General Statutes § 12-342 does not apply to the insurance policy in the case at hand, because credit life insurance is purchased for a different purpose from ordinary life insurance. By the very terms of the statute, however, § 12-342 applies to the policy in this case. Section 12-342 contains no limitation or distinction based upon the purpose for which the insurance was purchased.

tial conflict between the taxation policies underlying these two statutory provisions. This apparent conflict cannot be resolved, however, by scrutinizing only the "plain language" of the statutes, because each provision has a direct relationship to the case at hand. Accordingly, we turn to the legislative history of these provisions to resolve the conflict between them, guided by the principle of statutory construction that statutes in apparent conflict should be construed so as to achieve harmony between them. *State* v. *Tyson,* 195 Conn. 326, 331, 487 A.2d 1091 (1985). We are further guided by the principle that ambiguities in taxing statutes are to be resolved or construed in favor of the taxpayer. *National Amusements, Inc.* v. *Brown,* 171 Conn. 172, 176, 368 A.2d 1 (1976).

We turn first to the legislative history of what is now § 12-342. See *Dubno* v. *Colby,* 38 Conn. Sup. 54, 62, 458 A.2d 396 (1982). In 1929, the proceeds of life insurance policies payable at the death of the insured "to his estate, the executors of his will or the administrators of his estate" were first made explicitly subject to the succession tax by the legislature. Public Acts 1929, c. 299, § 4. In 1933, the legislature exempted "the proceeds of any policy of life or accident insurance payable to a named beneficiary," while continuing to tax proceeds payable to an estate, its executors or administrators. General Statutes (Cum. Sup. 1933) § 487c. There is no indication, however, due to the absence of a public hearing or other transcribed proceedings relating to this legislation, why the legislature drew a distinction for succession tax purposes based upon the identity of the recipient of the proceeds of a policy. The legislature broadened the exemption in 1963 to include "such proceeds payable to a trustee or trustees under an inter vivos or testamentary trust . . . . " Public Acts 1963, No. 514. The legislature did not disturb the clause that imposed the tax on the proceeds payable

to a decedent's estate. In 1969, however, the legislature again broadened the scope of the succession tax exemption to include "proceeds of any insurance policy of a decedent payable at his death to his estate, the executors of his will or the administrators of his estate." Public Acts, Spec. Sess., July, 1969, No. 784, § 1. This change is especially significant, because the legislature emphasized its purpose of achieving uniform treatment for all life insurance proceeds, regardless of the identity of the beneficiary.[4] It is with this legislative purpose in mind that we review the relevant history of § 12-350.

The starting point for our analysis of § 12-350 is this court's holding in *Connelly* v. *Wells,* supra, in which we construed General Statutes (Cum. Sup. 1953) § 923c (a), a predecessor of § 12-350. In *Connelly,* the tax commissioner maintained that the decedent's estate was not entitled to deduct from the gross taxable estate the amount representing the balance due on a note of the decedent, when the note was secured by an assignment of the decedent's life insurance policies, which were payable on his death to his wife. We observed in that case that at the time of the decedent's death, the estate became primarily liable for repayment of the loan, and that the bank continued to have a claim

---

[4] Senator John F. Pickett, Jr., for example, stated: "[A]t the present time under the succession laws of the State of Connecticut, the proceeds of an insurance policy payable to a named beneficiary are not subject to the succession taxes. However, for some strange reason, the proceeds of the policy payable to the estate are subject to the succession taxes. We think it makes good sense to be uniform about this and according to the intent of this bill, is to remove the succession tax implication or imposition on life insurance proceeds payable to the estate of a decedent." 13 S. Proc., Pt. 7, 1969 Sess., pp. 3095-96.

After Governor John Dempsey vetoed No. 784 of the 1969 Public Acts, the legislature overrode the veto, the records of its deliberations again indicating its desire to achieve uniformity in the treatment of insurance proceeds for purposes of the succession tax. 13 S. Proc., Pt. 8, 1969 Spec. Sess., p. 263; see *Dubno* v. *Colby,* 38 Conn. Sup. 54, 62, 458 A.2d 396 (1982).

against the estate before proceeding to liquidate the debt through the collateral it still held. We stated: "If the collateral securing the debt for which a deduction is claimed by the defendant is owned by the decedent, it would be included in the items going to make up his gross taxable estate. But if for any reason it is not owned by him and, hence, is not so included, the deductibility of the debt in ascertaining the net taxable estate is not affected, since the debt, no matter how secured, is nonetheless a debt and, as such, falls squarely within the provisions of § 923c (a)." Id., 534. Thus, we rejected the tax commissioner's claim that payment of the debt must be traceable to taxable assets, even though the identity of the insurance beneficiary was still relevant for taxation purposes. We further disagreed with the commissioner's claim that the deduction was improper because " 'the gross taxable estate was not reduced by one cent to satisfy [the] indebtedness to the bank.' " Id.

In 1969, the legislature amended the statute relating to deductions from the gross taxable estate, and inserted the provision that the enumerated deductions would be allowed, "provided they reduce the gross taxable estate." Public Acts 1969, No. 524. The commissioner claims that this provision was not a technical amendment, but rather, that its purpose was to "counteract the effect of the *Connelly* decision," by requiring that a debt be paid from taxable assets. We disagree. There is no indication in the legislative history that the General Assembly contemplated adding a new requirement that a debt must be paid from taxable assets to be properly deductible under § 12-350. Rather, the legislative history of No. 524 of the 1969 Public Acts indicates that the phrase "reduce the gross taxable estate" was enacted specifically to clarify confusion over the availability of a deduction for a widow's allowance payable out of income, rather than from principal.

Representative Richard L. Brinckerhoff's remarks on this point are compelling: "The purpose for the addition of the words in line 7, [']provided they reduce the gross taxable estate['] is due to the fact that in certain instances a widow's allowance, or a family's allowance has been awarded by a probate court but the court has required that it be taken from income rather than from principal and in those cases, of course, an income deduction would not be an allowable deduction for succession tax purposes. . . . [T]he only substantive change . . . would be to allow that one additional deduction from state succession tax, at the time of the death of the settlor in a trust." 13 H.R. Proc., Pt. 8, 1969 Sess., pp. 3745–46. The legislative history does not reveal that with respect to § 12-350 (h), the provision "reduce the gross taxable estate" was intended to add another requirement for the availability of a deduction. Indeed, the legislature made it clear that the purpose of the bill was to *add* to the number of deductions that would be allowable for state succession tax purposes, rather than to restrict that category. See 13 H.R. Proc., Pt. 8, 1969 Sess., p. 3744.

The commissioner claims that the mortgage debt did not "reduce the gross taxable estate" because it was not discharged with taxable assets. We disagree with the commissioner's interpretation of this provision, however, because it focuses on a time frame other than that which is specified in § 12-350. When the decedent died, liability for payment of the debt passed to his estate, for which CBT retained a bona fide claim against the estate. See *Connelly* v. *Wells*, supra, 534. Thereafter, if Aetna had not paid CBT the amount for which the decedent was insured, the estate's taxable assets would have been liable for payment of the indebtedness. Further, if the estate had discharged the mortgage debt immediately after the decedent's death, before Aetna had paid CBT, the estate would have been

subrogated to CBT's right to receive the proceeds of the Aetna policy. 1 J. Appleman, Insurance Law and Practice § 62.35. Accordingly, because the estate's taxable property was liable and available for payment of the debt, the mortgage indebtedness reduced the gross taxable estate at the time of the decedent's death. The fact that the debt was later discharged with tax exempt assets does not change the result, because § 12-350 focuses on the date of the decedent's death as the relevant time frame, rather than some date *after* the decedent's death. See *Newell* v. *McLaughlin,* 126 Conn. 138, 143, 9 A.2d 815 (1939).

The commissioner maintains that the debt should be treated as having been extinguished at the death of the decedent, because "everyone knew Aetna would pay it off." We will not base our decision, however, on the fortuity of the decedent's having transacted for credit life insurance with a company capable of fulfilling its obligation, rather than one less financially sound.[5]

Finally, the commissioner's interpretation of § 12-350 would seriously undermine the legislature's goal of uniformly exempting from state taxation all life insurance proceeds, regardless of the purpose for which the policy was purchased. As in this case, his interpretation would result in an indirect tax on otherwise tax exempt insurance proceeds, when the proceeds were used to discharge a debt that was the basis for a deduction under § 12-350. The commissioner has not given this court any persuasive reason why life insurance proceeds should be treated differently in such a situation. We

---

[5] "The possibility of insurer failure, however, is neither minimal nor remote. At the end of 1984, the National Association of Insurance Commissioners rated more than one in five insurance companies in the United States as being in questionable health and requiring careful monitoring. See Donne, *Guarantees of Safety for the Insurance Industry,* N.Y. Times, Aug. 10, 1985, at 23, col 1." B. McDowell, "Competition as a Regulatory Mechanism in Insurance," 19 Conn. L. Rev. 287, 306 n.83 (1987).

conclude, therefore, that the purpose of the 1969 revision of § 12-350 was "to clarify and make certain the law, not to bring within the scope of the statutes transfers which otherwise would not have been taxable." *Cochran* v. *McLaughlin,* 129 Conn. 176, 185, 27 A.2d 120 (1942).

There is no error.

In this opinion the other justices concurred.